IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IGT and IGT CANADA SOLUTIONS ULC, | § § | |
| Plaintiffs, | § § | Case No. 1:23-cv-00885-ADA |
| v. | § § | |
| ZYNGA INC., | § § | |
| Defendant. | § § § | |

**ZYNGA INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW
REGARDING INFRINGEMENT AND DAMAGES**

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.     LEGAL STANDARD ................................................................................................1

II.    ARGUMENT ..........................................................................................................1

    A.    NO REASONABLE JURY COULD FIND THAT THE ACCUSED
         PRODUCTS INFRINGE THE '189 PATENT........................................................1

         1.    No reasonable jury could find that the accused Zynga games and
               systems establish a wireless communications link. ....................................1

         2.    No reasonable jury could find that the stationary gaming terminal
               determines the award for the accused products and sends the award
               to the mobile device. ................................................................................3

         3.    No reasonable jury could find that the accused products extend
               animation "beyond a typical time for the game." ........................................5

         4.    No reasonable jury could find that the accused products reestablish
               the same communications link that previously failed................................6

         5.    No reasonable jury could find infringement under 35 U.S.C.
               § 271(f)....................................................................................................8

    B.    NO REASONABLE JURY COULD FIND THAT IGT HAS CARRIED
         ITS BURDEN TO PROVE DAMAGES ............................................................15

         1.    Dr. Ugone failed to apportion and IGT failed to offer any evidence
               that would allow the jury to do so, and used an improper damages
               base. ......................................................................................................15

          2.    No reasonable jury could award damages for pre-suit infringement........22

         3.    Substantial evidence does not support any award of damages. .................24

III.    CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Cases**

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
  876 F.3d 1350 (Fed. Cir. 2017) ................................................................................. 23, 24

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ....................................................................................... 22

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  576 F.3d 1348 (Fed. Cir. 2009) ....................................................................................... 12

*Commil USA, LLC v. Cisco Systems, Inc.*,
  575 U.S. 632 (2015) .................................................................................................. 13, 14

*Commonwealth Sci. & Indus. Research Organization v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ....................................................................................... 21

*Convolve, Inc. v. Compaq Comput. Corp.*,
  812 F.3d 1313 (Fed. Cir. 2016) ......................................................................................... 7

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
  559 F.3d 1309 (Fed. Cir. 2009) ....................................................................................... 23

*Elbit Sys. Land & C41 Ltd. v. Hughes Network Sys., LLC*,
  927 F.3d 1292 (Fed. Cir. 2019) ....................................................................................... 21

*Exmark Mfg., Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) ....................................................................................... 16

*Finjan LLC v. SonicWall, Inc.*,
  --- F.4th ---, 2023 WL 6775035 (Fed. Cir. 2023) ......................................................... 3, 7

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) .................................................................................. 15, 20

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
  909 F.2d 1464 (Fed. Cir. 1990) ....................................................................................... 10

*IBP v. Alvarez*,
  546 U.S. 21 (2005) ........................................................................................................... 14

*Life Techs. Corp. v. Promega Corp.*,
  580 U.S. 140 (2017) .................................................................................................. 12, 14

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
  449 F.3d 1209 (Fed. Cir. 2006) ....................................................................................... 14

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ............................................................................... 24, 25

*Maxwell v. J. Baker, Inc.*,
   86 F.3d 1098 (Fed. Cir. 1996) ....................................................................................... 23

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ...................................................................................................... 10

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
   10 F.4th 1358 (Fed. Cir. 2021) ...................................................................................... 22

*Omega Patents, LLC v. CalAmp Corp.*,
   13 F.4th 1361 (Fed. Cir. 2021) ...........................................................................20, 21, 22

*Pavo Sols. LLC v. Kingston Tech. Co.*,
   35 F.4th 1367 (Fed. Cir. 2022) ...................................................................................... 21

*Pellegrini v. Analog Devices, Inc.*,
   375 F.3d 1113 (Fed. Cir. 2004) ...................................................................................... 11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) ........................................................................................ 8

*Promega Corp. v. Life Techs. Corp.*,
   773 F.3d 1338 (Fed. Cir. 2014), *reaffirmed in* 875 F.3d 651 (Fed. Cir. 2017) ................... 14

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
   550 F.3d 1356 (Fed. Cir. 2008) ...................................................................................... 24

*TianRui Grp. Co. v. Int'l Trade Comm'n*,
   661 F.3d 1322 (Fed. Cir. 2011) ...................................................................................... 12

*Vectura Ltd. v. GlaxoSmithKline LLC*,
   981 F.3d 1030 (Fed. Cir. 2020) ...................................................................................... 21

*Vervain, LLC v. Micron Tech., Inc.*,
   No. 6:21-CV-00487-ADA, 2022 WL 23469 (W.D. Tex. Jan. 3, 2022) ................................. 1

*VirnetX, Inc. v. Cisco Sys.*,
   767 F.3d 1308 (Fed. Cir. 2014) ................................................................................. 15, 16

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ......................................................................................................... 1

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018) ................................................................................................... 12

*Zoltek Corp. v. United States*,
   672 F.3d 1309 (Fed. Cir. 2012) ...................................................................................... 14

**Statutes**

35 U.S.C. § 271(b) ........................................................................................................ 13, 14

35 U.S.C. § 271(f) ............................................................................................................ *passim*

35 U.S.C. § 271(f)(1) .......................................................................................................... *passim*

35 U.S.C. § 271(f)(2) .................................................................................................... 8, 11, 12, 13

35 U.S.C. § 287 ................................................................................................................ 23

35 U.S.C. § 287(a) ............................................................................................................ 23

**Other Authorities**

Fed. R. Civ. P. 50(a) .......................................................................................................... 1

Defendant Zynga Inc. respectfully moves pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law that it does not infringe the '189 patent and IGT is not entitled to any damages.

## I.     LEGAL STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a).  Rule 50 "allows the trial court to remove . . . issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result."  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotations omitted).

## II.     ARGUMENT

### A.     NO REASONABLE JURY COULD FIND THAT THE ACCUSED PRODUCTS INFRINGE THE '189 PATENT.

To establish infringement of a patent, "each and every limitation set forth in a claim [must] appear in an accused product."  *Vervain, LLC v. Micron Tech., Inc*., No. 6:21-CV-00487-ADA, 2022 WL 23469, at *5 (W.D. Tex. Jan. 3, 2022).  IGT accuses Zynga's Hit it Rich, Game of Thrones, and Black Diamond Casino games of infringing claims 1 and 10 of the '189 Patent.  No reasonable jury could find that these accused Zynga games infringe.

#### 1.     No reasonable jury could find that the accused Zynga games and systems establish a wireless communications link.

Claims 1 and 10 of the '189 patent require that the accused methods and systems perform the step of "establishing a wireless communications link between [a/the][1] mobile gaming device, operated by a player, and a stationary gaming terminal that carries out a gaming program."  This limitation requires a communications link with two specific characteristics—the link must be

---

[1] Claim 10 recites "the" rather than "a" mobile gaming device.

"wireless" *and* the link must be "between a mobile gaming device … and a stationary gaming terminal."  IGT has offered no evidence from which a reasonable jury could conclude that the accused Zynga games and systems establish such a communications link.

IGT's expert, Mr. Friedman, testified that the claimed "mobile gaming device" is the player's "phone or the[ir] tablet" and the claimed "stationary gaming terminal" is an "Amazon Web Services or AWS server[]" that runs Zynga's server software.  Tr. 325:-9-13, 405:12-23.  But Mr. Friedman cited no evidence to support his opinions (1) that there is a communications link between these two devices, or (2) that any communications link is wireless.

There is no communications link between the player device and the Zynga server.  Instead, the link is between the player device and the AWS *load balancer*.  Load balancers, as the name suggests, distribute requests across a group of servers to ensure that no one server becomes overburdened.  *See* Tr. 406:10-14.  Here, the load balancer is not the accused "stationary gaming terminal," nor could it be.  The stationary gaming terminal must be the device that "carries out a gaming program," which is a backend server.  Mr. Friedman admitted on cross-examination that when a player's gaming device attempts to communicate with the Zynga server, the gaming device's request is actually sent not to the servers themselves but to the AWS *load balancer*.  Tr. 406:5-7, 15-21.  Thus, Mr. Friedman offered no evidence that there is any communications link between the device and server.  No reasonable jury could conclude that a communications link between the gaming device and the *load balancer* constitutes a communications link between the gaming device and the *AWS server* that is programmed to carry out the game.  Because this element of the claims is missing, there is no infringement.

Separately, Mr. Friedman failed to offer any testimony from which a reasonable jury could conclude that any communications link between the user device and the Zynga server is

"wireless."  Mr. Friedman admitted that, with respect to the accused games and systems, the communication occurs over the Internet.  Tr. 285:1-3.  And Mr. Friedman did not dispute on cross-examination that a person of ordinary skill would understand that the Internet relies on wired communications at various points, including ethernet cables connecting to routers.  Tr. 402:21-403:6, 405:24-406:4.  Among other things, Mr. Friedman also conceded that unplugging this type of wire causes a communications link failure.  Tr. 286:19-22 (stating that he "disconnected [his] WiFi router from the Internet" to cause a communications link failure). Mr. Friedman thus offered no evidence that the communications link he identified is wireless. Because Mr. Friedman does not dispute that at least some part of the communication path between the player device and the stationary gaming terminal is wired, no reasonable jury could find that any accused communications link is "wireless," and the claims are not infringed.

### 2. No reasonable jury could find that the stationary gaming terminal determines the award for the accused products and sends the award to the mobile device.

Claims 1 and 10 both require the "stationary gaming terminal" to "determine[] … any award for the outcome" of the game.  Then the gaming terminal must "transmit[] the signals to the mobile gaming device identifying the final outcome of the game and *the* award" before the mobile device "display[s] … the final outcome of the game and *the* award."  (Emphasis added.) The accused products do not satisfy this determining/transmitting limitation because, in Zynga's system, the mobile device calculates the award.  In other words, the gaming terminal neither determines the award nor transmits it to the mobile device.

By using the singular article "the" in front of "award" two different times, the claims make clear that infringement occurs only if "the award" that the mobile device displays is the same "award" that the gaming terminal (the AWS server) transmits to the mobile device.  *See Finjan LLC v. SonicWall, Inc.*, --- F.4th ---, 2023 WL 6775035, at *7 (Fed. Cir. 2023) ("the use

of 'the' also indicates the claimed term refers to an antecedent term").  That is not the case for Zynga's games.  As the jury heard from Mr. Hall, although the server "provide[s] some *base information* about what was won," the mobile device provides the actual "value" of the award after receiving that base information.  Tr. 245:18-246:1 (emphasis added).

Mr. Friedman agreed and explained the process to the jury:  "[T]he server determines the award in credits" and transmits that number to the mobile device, but the mobile device then "will multiply that and show [the player] a larger number in coins."  Tr. 329:21-25; *see also* Tr. 329:15-19 (explaining that, before displaying an award to the player, the mobile device uses "an economy multiplier to increase the number of coins").  Simply put, the award that the mobile device displays to the player differs from the credits that the server determines, and the displayed award is not determined until the mobile device applies the multiplier.  For example, if a player wins a spin and the gaming terminal determines (and then transmits) a credit of 1,250,000, the mobile device will multiply that number by the current multiplier—say, 200—and then display an award of 250,000,000.  Obviously, the award that the mobile device displays does not match the credit that the gaming terminal determines and transmits.

To be sure, Mr. Friedman emphasized that the AWS server resolves the outcome of any given spin.  *E.g.*, Tr. 301:1-3.  But that is undisputed.  What matters is that the claims require *one* award that the gaming terminal determines and transmits and the mobile device then displays.  Here, the award the mobile device displays is not the award determined and transmitted by the gaming terminal.  At most, Mr. Friedman showed that the server determines some "award *information*"—in other words, the credits that it sends to the mobile device.  Tr. 330:8-12.  But "award information" is not "the award."  Thus, no reasonable jury could find that the accused products infringe the determining/transmitting limitation of Claims 1 and 10.

###### 3.   No reasonable jury could find that the accused products extend animation "beyond a typical time for the game."

Claims 1 and 10 both require that, if the communications link fails, the mobile device "extend[s] the game animation … beyond a typical time for the game."  IGT failed to prove that the accused products have typical times beyond which they could extend animation.

To start, everyone agrees that a game begins when the player initiates the game, such as by pressing the "spin" button.  *E.g.*, Tr. 284:25-285:1 (Mr. Friedman: "And when the user presses the spin button, the casino experience will begin. The reels will start."); Tr. 396:13-16. And Mr. Friedman conceded that a game ends when "the display of a spin outcome and award to the player" is "finished."  Tr. 396:17-397:3.  The text of the asserted claims confirms the same: The game animation stops only when the mobile device receives and displays "the final outcome of the game and the award."  Thus, the time from when the reels start spinning to when they stop and the player sees the outcome (and any award) is what matters for assessing whether a game has a "typical time."

IGT has no evidence of that relevant time period for the accused products.  Mr. Friedman admitted that he tested only the time from "when the reel spin starts" until "the reels start resolving."  Tr. 345:5-8, 398:4-13.  But as the jury saw for itself in multiple videos of the accused products, the reels resolve one by one rather than simultaneously.  PTX1299; PTX1302; PTX1308; *see also* Tr. 272:4-8 (Mr. Friedman acknowledging that the reels resolve "left to right, one at a time").  When the first reel starts to resolve, the other reels continue spinning, and the mobile device has not yet displayed the outcome or the award.  PTX1299; PTX1302; PTX1308. Again, the jury saw this in the videos.  And Mr. Friedman conceded that, when he stopped measuring the time of the animation, "[t]he outcome [and] the award had not finished their display."  Tr. 399:1-5.  So Mr. Friedman simply offered no evidence of the typical time for any

accused game.

Of course, despite acknowledging that a game ends only when the player learns the outcome and any award, Mr. Friedman maintained that the typical time for a game runs from when the player presses "spin" until the first reel starts to slow down. But he admitted that the '189 patent does not teach measuring the typical time for a game from the initial reel movement to when the first reel starts to slow down. Tr. 401:1-12. Besides, even Mr. Friedman's testing of the period until the first reel slows showed no typical time for that event. For the web version of Hit It Rich, for example, he observed spin times ranging from 0.433 seconds to 0.766 seconds—almost double. PTX1472. Likewise, for the app version of Games of Thrones, he reported spin times ranging from 0.603 seconds to 1.072 seconds. PTX1472. And Mr. Friedman admitted that the times "would have increased" if he "had a slower Internet connection," showing that the times he measured are not "typical" at all. Tr. 344:5-16; *see also* Tr. 411:19-23 ("Well, in my house, it's very—incredibly short. I can't say typically across, like, the universe of players because I don't have knowledge of, you know, how many other players are playing at—when they're, you know, in a park or something."); Tr. 412:19-24 (Mr. Friedman stating that "the user's network speed" will "define their typical time").

In short, no reasonable jury could find that the accused products extend the game animation "beyond a typical time for the game," because no reasonable jury could find that the accused products have a typical time in the first place.

### 4.    No reasonable jury could find that the accused products reestablish the same communications link that previously failed.

Claims 1 and 10 both require that, after "*the* communications link fail[s]," "*the* communications link" must be "re-established." (Emphasis added.) Then, "once the communication link has been re-established," the gaming terminal must transmit the outcome

and the award to the mobile device.  The accused products do not satisfy this reestablishing

limitation because, even assuming that there is a communications link between an AWS server

and a mobile device before the communications link fails, the link established after the failure

connects a different AWS server and the mobile device.  In other words, the accused products do

not reestablish the same communications link; they establish a new one instead.

 As with "the award," by using the article "the" in front of "communications link"

multiple times, the claims require that the reestablished communications link must be the *same*

communications link that existed before the link failed.  Put differently, the claims' "use of

'the'" shows that "the claimed term refers to an antecedent term": here, "a wireless

communications link."  *Finjan*, --- F.4th ---, 2023 WL 6775035, at *7.  Thus, the claims

"require[] that the same [communications link]" be reestablished.  *Id.* at *8; *see also Convolve,*

*Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) ("This reference to 'the

processor,' referring back to the 'a processor' recited in preamble, supports a conclusion that the

recited user interface is 'operatively working with' the same processor to perform all of the

recited steps.").  That interpretation of the claims also accords with the ordinary meaning of the

prefix "re."  You cannot, for example, "revisit" a place that you have never been to before, or

"remake" a dish that you have never cooked before.

 Here, assuming for the sake of argument that a communications link ever forms between

an AWS server—which Mr. Friedman admitted is the gaming terminal here, Tr. 405:12-23—and

the mobile device, after that first link fails, a *new* link forms.  As the jury heard, the AWS servers

running Zynga's games sit behind a load balancer.  *See* Tr. 253:19-254:16, 406:5-7.  The load

balancer routes requests "across software that's installed on multiple servers," as Mr. Friedman

acknowledged.  Tr. 406:10-21.  Mr. Friedman also acknowledged that the number of servers

running the accused games is "dynamic": "If you have more user load, you can spin up more servers to handle that user load." Tr. 407:10-14.

IGT failed to introduce any evidence that, after a communications link failure, the mobile device would communicate with the same server as before instead of forming a new communications link with a different server. In fact, IGT itself read into the record Zynga's interrogatory responses indicating that, for each accused product, "the client communicates with an AWS server *or servers* to determine the outcome." Tr. 223:14-16 (Black Diamond Casino), 223:22-24 (Hit It Rich), 224:5-7 (Game of Thrones Slots) (emphasis added). And Mr. Friedman admitted at his deposition that he had no opinion on whether establishing "a new communication link between different devices"—the mobile device and a second server—would satisfy the claims' limitation of reestablishing the communication link. Tr. 416:1-16.

In any event, IGT has zero evidence of any instance of a Zynga game reestablishing a connection with the same AWS server as the initial connection, nor did IGT identify any source code that would cause that to happen. IGT thus failed to prove infringement. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1376 (Fed. Cir. 2013) ("[W]e consistently require that the record demonstrate something more than speculation that infringing activity has occurred.").

###### 5.     No reasonable jury could find infringement under 35 U.S.C. § 271(f).

IGT contends that Zynga infringes claim 10 under § 271(f)(1) and (f)(2), which provide as follows:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United
States any component of a patented invention that is especially made or especially
adapted for use in the invention and not a staple article or commodity of commerce
suitable for substantial noninfringing use, where such component is uncombined in whole
or in part, knowing that such component is so made or adapted and intending that such
component will be combined outside of the United States in a manner that would infringe
the patent if such combination occurred within the United States, shall be liable as an
infringer.

But there is no evidence from which a reasonable jury could conclude that Zynga infringes under

either provision.  IGT failed to show that: (a) Zynga supplies any "components" of claim 10; (b)

any components are "combined" outside the United States; (c) Zynga supplies a "substantial

portion" of claim 10's components outside the United States, as § 271(f)(1) requires; or (d)

Zynga had any knowledge of the '189 patent or intent to cause an infringing combination abroad.

These are each independent reasons to grant JMOL in favor of Zynga.

> **a.     No reasonable jury could find that Zynga supplies any
> component of claim 10.**

IGT contends that Zynga supplies three "components" under § 271(f): (1) server-side

software; (2) various "signals" that transmit the outcome and the award of a game and establish a

communications link; and (3) the mobile software, or "game app."  But IGT failed to prove that

any of these three are "components" within the meaning of the statute.

First, as Mr. Hall explained, the AWS servers reside only in Virginia and Oregon.  Tr.

254:8-16; *see* Tr. 255:12-256:7 (Mr. Hall explaining that Zynga previously used servers in

Singapore for clients in some Asian countries but stopped using those servers "nine to ten years"

before Mr. Hall's 2022 deposition).  Although § 271(f) requires components to be supplied "in or

from the United States," the components must ultimately be combined "outside of the United

States" (or the defendant must at least intend for them to be combined outside the United States).

The server-side software does not fit that bill, because it, like the AWS servers, never leaves the

United States.

Second, the signals do not qualify as "components" of claim 10.  Claim 10 is a system claim that comprises "a stationary gaming terminal communicating with a mobile gaming device," where the system is "programmed to carry out" functions such as "receiving" and "transmitting" signals.  But apparatus claims "cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990).  Here, the signals are merely functions that the claimed system is capable of creating according to its programming.  The signals are not themselves components of claim 10. So even if a "signal" could be a component supplied abroad, but see *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007), that would be irrelevant here where the signal is *not* a component of the claim.

Third, IGT failed to introduce any evidence that Zynga supplies "the copies [of the mobile device software] actually installed" on users' devices.  *Id.* at 443.  Contrary to Mr. Friedman's testimony that Zynga's game app, e.g., the mobile gaming software, is a component, Tr. 371:1-11, 374:4-6, *Microsoft* rejected the argument that "software, uncoupled from a [computer-readable] medium," constitutes "a combinable component" under § 271(f), 550 U.S. at 450.

And the facts here closely resemble the conduct that *Microsoft* held did not infringe § 271(f).  There, the defendant sent foreign manufacturers a "master version" of the defendant's infringing software, "either on a disk or via encrypted electronic transmission."  *Id.* at 445.  The foreign manufacturers then used the master version to make copies of the software and sold those foreign-made copies to users abroad.  *Id.*  Thus, the defendant did not infringe under § 271(f), because it did not supply the copies of the software that were "combined abroad to form the patented invention at issue."  *Id.* at 453.

So too here.  As Mr. Friedman told the jury, Zynga releases its mobile games, including

the accused products, through the App Store. Tr. 370:25-371:11, 373:13-15. Zynga provides a copy of each game to the App Store. *Id.* And when users download a game, the App Store provides a copy of the software to users. *Id.* Thus, even if the App Store-made copies are combined abroad in a manner that infringes the '189 patent, Zynga does not supply those copies, and no reasonable jury could find otherwise.

**b.    No reasonable jury could find that any components supplied by Zynga are combined outside the United States, or that the complete invention is made abroad.**

Everyone agrees that the server-side software exists only in the United States. *E.g.,* Tr. 405:21-23. That leaves just the signals and the mobile device software as components that IGT alleges Zynga supplies for combination abroad. But, as explained above, the signals are *not* components of the claimed system; they are functions that the claimed system must be programmed to be *capable* of creating. *Supra* § II.A.5.a. So even assuming for the sake of argument that the signals and the mobile device software are combined abroad, no reasonable jury could find infringement under § 271(f) because that is not a "combination of … components," but rather a combination involving a singular component (the mobile device software). *See Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1118 (Fed. Cir. 2004) (explaining that no liability arises under § 271(f)(1) "unless *components* are shipped from the United States for assembly" (emphasis added)).

Section 271(f) also makes clear that what is combined abroad (or, for 271(f)(2), what is intended to be combined abroad) must be the complete combination, and occur *outside* of the United States: §§ 271(f)(1) and (2) refer respectively to "the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States" and "intending that such component will be combined outside

11

of the United States in a manner that would infringe the patent if such combination occurred within the United States." *See also, e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137-38 (2018)("§ 271(f) … 'reach[es] components that are manufactured in the United States but assembled overseas.'"); *TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1334 (Fed. Cir. 2011) ("§ 271(f), allows infringement to be found when the 'components' of a patented invention are supplied from the United States and combined abroad."); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1364 (Fed. Cir. 2009) ("Congress was clearly focused on closing the loophole presented in *Deepsouth*, *viz.*, that shipping an unassembled patented product abroad for later assembly avoids patent infringement."). Here, for the reasons explained above, the server-side software, like the AWS servers, never leaves the United States, and so there is never any complete combination outside the United States that infringes claim 10. At most, a single component of the invention exists abroad. Accordingly, no reasonable jury could find that IGT satisfies either § 271(f)(1) or § 271(f)(2).

### c.   No reasonable jury could find that Zynga supplies a "substantial portion" of claim 10's components outside the United States under § 271(f)(1).

For similar reasons, no reasonable jury could find that Zynga supplies "a substantial portion of the components" of claim 10 for combination outside the United States, as § 271(f)(1) requires. Again, the signals are not components, and the server-side software never leaves the United States. Plus, Zynga does not supply the copies of the accused products that foreign users download to their mobile devices. But even if Zynga supplied those copies, it would be supplying, at most, a single component of claim 10. And "one component does not constitute 'all or a substantial portion' of a multicomponent invention under § 271(f)(1)." *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 151 (2017).

          **d.**      **No reasonable jury could find that Zynga had the requisite knowledge and intent for infringement under § 271(f) before IGT filed the complaint, and IGT has no evidence of intent post-complaint.**

IGT has never disputed that § 271(f)(2) "require[s] knowledge of the patent and infringement." Dkt. 170 at 7.  Section 271(f)(2) also requires that the defendant "intend[]" that any component it supplies "will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."  Here, IGT offered no evidence that Zynga knew of the '189 patent before IGT filed its complaint in April 2021.[2]  IGT likewise offered no evidence that—even if Zynga supplied any components within the meaning of § 271(f)(2)—Zynga intended the components to be combined abroad in an infringing manner before IGT sued here.  Thus, no reasonable jury could find Zynga liable for pre-suit infringement under § 271(f)(2).

The same holds true for § 271(f)(1), which also uses language requiring knowledge and intent to cause infringement.  Specifically, § 271(f)(1) requires the defendant to supply in or from the United States "all or a substantial portion of the components of a patented invention … in such manner as to *actively induce* the combination of such components outside of the United States in a manner that would infringe the patent" if it occurred in the United States.  (Emphasis added.)  In *Commil USA, LLC v. Cisco Systems, Inc.*, the Supreme Court held that § 271(b)'s substantively identical language—"[w]however actively induces infringement of a patent"— "requires intent to bring about the desired result, which is infringement.".  575 U.S. 632, 642 (2015) (internal quotation marks omitted).

Plainly, § 271(f)(1)'s "actively induce the combination" phrase "mimics the language of

---

[2] Accordingly, the Court granted Zynga's motion for summary judgment of no willfulness.  Dkt. 271 at 2.

the indirect infringement provision[] of section 271(b)." *Zoltek Corp. v. United States*, 672 F.3d 1309, 1334 n.6 (Fed. Cir. 2012).  And when Congress uses the same words in the same statute, courts should presume that they "have the same meaning." *IBP v. Alvarez*, 546 U.S. 21, 34 (2005).  Moreover, the Federal Circuit reaffirmed post-*Commil* that § 271(f)(1) requires "the specific intent to cause the combination of the components of a patented invention outside the United States." *Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1351 (Fed. Cir. 2014) (holding), *reaffirmed in* 875 F.3d 651, 654 (Fed. Cir. 2017); *see also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1222-23 (Fed. Cir. 2006) (affirming an infringement verdict under § 271(f)(1) where the evidence showed "the requisite intent").  An alleged infringer could not have that specific "intent to bring about the desired result" of "the combination of the components *of a patented invention* outside the United States" without first knowing of the patented invention.  *See Commil*, 575 U.S. at 642; *Promega*, 773 F.3d at 1351.

Again, IGT offered no evidence that, before this case began in April 2021, Zynga knew of the '189 patent or had § 271(f)(1)'s requisite intent to "induce the combination" of components outside the United States in a way that would infringe the '189 patent if it occurred in the United States.  Thus, at minimum, no reasonable jury could find Zynga liable for pre-suit infringement under § 271(f)(1).

IGT also failed to offer any evidence that, even after Zynga became aware of the '189 patent when IGT sued here, Zynga had any intent for the alleged components to be combined in an infringing way outside the United States.  Quite the opposite:  Zynga maintains a reasonable belief that the accused products do not infringe the '189 patent for the reasons explained above.  And IGT has no evidence whatsoever to show that Zynga had the necessary mental state to infringe under § 271(f) after IGT filed its complaint.  Thus, no reasonable jury could find Zynga

liable for post-suit infringement under § 271(f) either.

**B.      NO REASONABLE JURY COULD FIND THAT IGT HAS CARRIED ITS BURDEN TO PROVE DAMAGES**

IGT bore the burden "of proving damages by a preponderance of the evidence" and supporting any award "with reliable evidence." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310, 1313 (Fed. Cir. 2018).  IGT failed to meet its burden.

**1.      Dr. Ugone failed to apportion and IGT failed to offer any evidence that would allow the jury to do so, and used an improper damages base.**

Dr. Ugone admitted at trial that he did not apportion the royalty base.  *See, e.g.*, Tr. 517:10-519:2 (admitting on cross examination that in reaching his ultimate conclusion, Dr. Ugone used as his royalty base Zynga's worldwide bookings, minus China, that are associated with the accused Zynga games and that apart from global bookings percentage and exclusion of China bookings, he made no deductions to Zynga's reported worldwide bookings).  Dr. Ugone used *all revenue* attributable to the Accused Products for the '189 patent, *id.*, despite acknowledging that the Accused Products include many features beyond the asserted claims, *e.g.* Tr. 525:20-24 (agreeing that the '189 patent is not the only basis for customer demand of the accused slot games).  With respect to the base, Dr. Ugone performs no "analysis" at all beyond eliminating certain broad categories of unaccused revenue.  But that is not apportionment; that is just the minimally necessary, but not sufficient, first step of identifying the accused revenue. *See, e.g.*, *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).

In fact, Dr. Ugone did not even perform that minimally necessary first step of identifying the accused revenue.  Dr. Ugone's royalty base includes not only unaccused features—i.e. failure to apportion—but also unaccused, admittedly noninfringing revenue.  Dr. Friedman admitted that if a player accesses a game on a wired desktop, for example visiting HitItRich.com and playing a

slot game, that does not infringe.  Tr. 404:16-21.  But Dr. Ugone used IGT's entire revenue from the accused games as his royalty base, Tr. 517:10-519:2, even though users may play on a wired desktop, and IGT introduced no evidence from which the jury could take that money out from the royalty base.  IGT's failure to exclude unaccused revenue renders its damages number unreliable, separate and apart from the failure to apportion the base.

Because Dr. Ugone did not apportion the royalty base to exclude the value of non-infringing features, apportionment through the royalty rate was required.  *Exmark Mfg., Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("apportionment can be addressed . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features.").  "The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product."  *VirnetX*, 767 F.3d at 1329. Rather than apportion, Dr. Ugone simply relied upon the rates from several non-comparable portfolio licenses and IGT's aspirational opening rate request, without providing any testimony or evidence from which a jury could reliably reduce those rates to just the technological value of the '189 patent.  By relying solely on portfolio licenses with no testimony or evidence that would allow a jury to apportion the rate down to the value of the '189 patent, IGT failed to provide the jury with reliable evidence of damages.

Dr. Ugone admitted that in the hypothetical negotiation, IGT would only be licensing the '189 patent, and that the payment the parties would negotiate would not include value unrelated to the '189 patent.  Tr. 524:3-525:15.  Similarly, Dr. Ugone admitted that the '189 patent is not the only basis for customer demand for the accused slot games.  Tr. 525:20-24.

Given these admissions, Dr. Ugone had an obligation to apportion the royalty rate to the value of the '189 patent alone.  He did not do so.  Instead, Dr. Ugone lifted the portfolio rates from his "indicators of value" and concluded that the parties would arrive at one of those rates in the hypothetical negotiation.  Specifically, Dr. Ugone's ultimate 3% rate matches the 3% rate from the EMC/Mylex license.  Tr. 543:17-544:1.  As Dr. Ugone acknowledged, this agreement was made sixteen to seventeen years prior to the date of the hypothetical negotiation in this case, Tr. 544:2-4, and does not include the '189 patent, Tr. 546:2-4.  Neither IGT nor Zynga were parties to the agreement.  Tr. 546:10-12.  Indeed, EMC and Mylex were involved in totally different businesses from IGT and Zynga, and neither made any kind of slot machine games, Tr. 546:17-24; and Mylex had nothing to do with gaming or video games, Tr. 547:4-6.  Dr. Ugone acknowledged that while the hypothetical negotiation in this case involved only a single patent, EMC-Mylex involved 53 patents, none of which were the '189 patent.  Tr. 546:2-4, 546:13-16.  Dr. Ugone also acknowledged that he didn't consider EMC and Mylex's market share, because he didn't have that information.  Tr. 547:22-24.

Dr. Ugone acknowledged that he was relying on IGT's technical expert, Mr. Friedman's, conclusion that only three of the EMC patents licensed to Mylex were technologically comparable to the '189 patent.  Tr. 548:1-10.  While Dr. Ugone insisted that Mylex must have practiced at least some of the patents in the portfolio license as a whole, he admitted that he did not know whether Mylex practiced any of those (purportedly) technologically comparable patents, admitting that "[of] the 53" patents in the portfolio license as a whole "I don't know what they're using."  Tr. 548:11-549:6.  Thus, Dr. Ugone has no basis for concluding that any party paid 3% for a license to use technology allegedly comparable to the '189 patent.

As Dr. Ugone acknowledged, this license's 3% rate gave the licensee the right to use *53* patents in the portfolio.  Tr. 449:23-550:1.  Notwithstanding the differences between this storage portfolio license and a single gaming patent, Dr. Ugone testified that he considered this 3% rate to be an indicator of value in his analysis.  Tr. 449:18-22.  Dr. Ugone testified that he was "using it as a guidepost" and an "input for consideration."  Tr. 550: 10-21.

But rather than apportion that 3% rate, Dr. Ugone testified that the 3% rate for the portfolio license supports a 3% rate for the '189 patent alone based just on a handful of other purportedly comparable licenses, Tr. 504:23-505:8, "the aura in the room," Tr. 554:13-554:4, and "IGT's negotiating position," Tr. 504:23-505:8.

Dr. Ugone refused to apportion the value of the '189 patent from the other purportedly comparable licenses as well, a failing he never made up elsewhere.  *Cf.* Tr. 554:13-554:4 (Dr. Ugone testifying that based on each of these portfolio license rates, he used "the aura in the room" to assess the upward or downward pressure in the hypothetical negotiation).  For example, presented with a list of the input agreements and term sheets that he used in forming his reasonable royalty opinion, Dr. Ugone agreed that that list referenced four agreements and one term sheet.  Tr. 550: 25-551:17.  On cross examination, he did not dispute that each of these inputs is a portfolio license.  Tr. 551:18-552:7; Tr. 553:4-6.  From each of those portfolio license inputs, Dr. Ugone took the rates directly from those portfolio licenses and term sheets.  Tr. 552:8-553:3.

Dr. Ugone's reliance on other agreements only makes clearer still his failure to apportion.  Dr. Ugone admitted that one of the licenses, Greentube, was a license to "about 250" patents, of which the '189 patent was only one of the 250.  Tr. 539:16-540:11.  Dr. Ugone acknowledged that he did not have "insight" into the question of whether Greentube even uses the technology

claimed in the '189 patent.  Tr. 540:12:-19; *see also* Tr. 543:5-9.  But nonetheless, Dr. Ugone's ultimate conclusion was that the parties here would have agreed to a 3% rate for the '189 patent *alone*, *see supra*, notwithstanding Greentube's 6% rate for a 250-license portfolio of which the '189 patent was only one patent, Tr. 539:16-540:11, which Greentube does not necessarily even practice or use, Tr. 540:12:-19, 543:5-9.

Similarly, Dr. Ugone reached his ultimate 3% rate opinion, *see supra*, based on the input of IGT's offer to Aristocrat to license IGT's entire RGS portfolio—of which the '189 patent was one of approximately 98 patents—at a 6% rate.  Tr. 531:16-532:7; 534:2-5.  Dr. Ugone admitted that he has never seen any agreement that licenses the '189 patent—or *any* single IGT patent— alone to any company for a 6% rate.  Tr. 533:8-16.  Dr. Ugone also relied on an actual 2022 agreement between IGT and Aristocrat, in which Aristocrat licensed over 2,000 IGT patents, including approximately 100 "RGS" patents.  Tr. 533:17-534:12.  Dr. Ugone admitted that because the Aristocrat agreement includes multiple patent portfolios that IGT licensed, that agreement does not provide a direct and isolated licensing value for the '189 patent.  Tr. 534:13-19.  Dr. Ugone also admitted that he does "not use this agreement or treat it in a way that will give me an individual value of the patents-in-suit or even RGS."  Tr. 535:5-536:9.  As he acknowledged, the "Aristocrat" license uses a 6% rate for a "broad portfolio" agreement between IGT and Aristocrat.  Tr. 539:2-15.  Here too, the '189 patent is only one of *98* patents in the purportedly comparable license agreement.  Tr. 537:20-539:5.  And Dr. Ugone has no "insight" into whether Aristocrat even uses *any* of the RGS patents.  Tr. 536:10-14.  But according to Dr. Ugone the parties would have reached this 3% rate even though they would consider only the benefits attributable to the '189 patent's invention when negotiating this royalty.  Tr. 539:2-15.

Dr. Ugone also admitted that Aristocrat and Greentube "inputs" covered, at minimum, IGT's RGS portfolio. The RGS portfolio includes, at one time, 98 patents across nine different categories. PTX118; Tr. 537:20-25. The '189 patent falls within one of those buckets, along with at least ten other patents in the same bucket. Tr. 538:18-21. Dr. Ugone did not address the relative value of the RGS patents to the other patents covered by the "inputs," the value of the '189 patent's bucket ("real-time game response and player outcomes"), or the value of the '189 patent to the other patents in that bucket. Dr. Ugone did not even name the other "buckets" within the RGS portfolio. Instead, Dr. Ugone testified that his ultimate opinion relied on those portfolio license rates, taken directly from the portfolio licenses and term sheets, Tr. 553:1-3, and any adjustments were made just based on the parties' "negotiating position," including the "aura in the room." Tr. 553:13-554:22. But whatever "aura" guided Dr. Ugone, he gave the jury no reasonable basis to determine that the "aura" in any way isolated the specific value of the invention claimed by the '189 patent.

Nor do Mr. Calogero's statements reflect any kind of apportionment. Mr. Calogero testified that when IGT is negotiating a license to the RGS patent portfolio, IGT has an "asking price" of "6 percent." Tr. 168:25-169:6. But the Federal Circuit has made clear that a party's aspirational preferred rate or opening demand *cannot* form "the basis for a reasonable royalty calculation." *Finjan*, 879 F.3d at 1311-12; *Omega Pats., LLC*, 13 F.4th at 1379 (reliance on preferred negotiating rate would "improperly permit Omega to hide behind its generic licensing arrangement to avoid the task of apportionment"). And IGT's aspirations have never come to fruition. IGT has never licensed any single patent in its RGS portfolio, or the 189 patent, at 6%. Tr. 533:8-16. And "absent evidence of a comparable license or comparable negotiation to support an identical [6%] rate for a one-patent license to the ['189] patent, we fail to see how this

patent/claim-independent approach accounts for apportionment." *Omega Pats., LLC*, 13 F.4th at

1379.  For all of these reasons, Dr. Ugone has failed to apportion and IGT has failed to give a

reasonable jury any legally sufficient basis on which to award damages at trial.

      Dr. Ugone's testimony also cannot be justified after the fact as relying upon

apportionment that is "baked in" or "built in"—Dr. Ugone's theory in his expert report, which he

did not rely upon at trial.  He did not present any such testimony, so the jury could not have

relied up on it.  And in any event, Dr. Ugone's testimony fails as a matter of law to meet the

narrow set of circumstances in which the Federal Circuit has accepted "built in" apportionment.

Critically, Dr. Ugone's testimony *cannot* establish any built-in apportionment because the

licenses and pre-license communications that Dr. Ugone relied upon are for portfolios covering

dozens of patents, entire software products, and/or entire areas of technology, not to small sets of

features analogous to those accused in this case.  Because IGT has neither offered evidence

regarding the apportionment of damages nor given the jury any evidence from which *it* could

apportion, any damages award would not be supported by substantial evidence.

      Built-in apportionment applies only in limited circumstances, like in cases where the

licenses and negotiations involve the same asserted patents, the same accused technology, the

same parties, or some combination of these factors.  *See Commonwealth Sci. & Indus. Research*

*Organization v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302-04 (Fed. Cir. 2015) (negotiation involving

the actual litigants, the asserted patent, and the accused technology); *Elbit Sys. Land & C41 Ltd.*

*v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1300 (Fed. Cir. 2019) (license involving one

litigant and substantially the same accused technology (i.e., one-way versus two-way satellite

communication)); *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022)

(license involving the asserted patent); *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030,

1040-41 (Fed. Cir. 2020) (license involving the actual litigants and the accused technology); *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374-77 (Fed. Cir. 2020) (license involving the accused technology (i.e., microfluidic biological reactions) and the expert opined that "the importance of that technology to the particular license was similar to the hypothetical negotiation"). As these cases show, built-in apportionment requires much more than mere comparability. *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021) ("For built-in apportionment to apply the license must be 'sufficiently comparable' in that 'principles of apportionment were effectively baked into' the purportedly comparable license."); *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1374 (Fed. Cir. 2021) (noting that Federal Circuit has previously approved built-in apportionment where district court "relied on proposed royalty rates from prior negotiations between the parties to the litigation involving the same patent and accused technology" and where experts "account for the differences between the accused technology and the licensed technology").

Here, by contrast, each of Dr. Ugone's relied-upon licenses are drastically different from the hypothetical negotiation due to differences in parties, no similarity in accused products, drastically different licensed patents, or a combination thereof. *See MLC Intell. Prop., LLC*, 10 F.4th 1358 at 1374-75 (holding that "comparable license theory does not properly apportion for the value of the patented technology" where expert failed to "account for any differences" between "the licensed technology versus the accused technology" and relied upon a portfolio license rather than "a license for the same single patent").

### 2. No reasonable jury could award damages for pre-suit infringement.

No reasonable jury could award damages for pre-suit infringement because IGT failed to mark products that practice the '189 patent and thus failed to give notice of the patent to Zynga until it filed this case.

When a patentee fails to "mark" a product to show that it practices a particular patent, the patentee cannot recover damages for infringement unless the defendant "was notified of the infringement," in which case the patentee may recover damages "only for infringement occurring after such notice." 35 U.S.C. § 287(a).[3] A defendant who disputes the patentee's compliance with § 287's marking requirement "bears an initial burden of production to articulate the products it believes are unmarked 'patented articles.'" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). This burden is a "low bar"; it requires only "notice" that the patentee or a licensee "sold specific unmarked products which the alleged infringer believes practice the patent." *Id.* After the defendant clears that low bar, the burden shifts to the patentee to "prove" that the identified products "do not practice the patented invention." *Id.*

Here, Zynga met its minimal burden of production to identify unmarked products. As Mr. Calogero admitted, Tr. 202:10-203:13, Zynga sent a letter to IGT in August 2022 identifying products that IGT and its licensee DoubleDown Interactive (formerly known as DoubleU Diamond) failed to mark. And Mr. Calogero also admitted that IGT's license agreement with DoubleU Diamond did not "require DoubleU Diamond to mark any of its products with IGT patent numbers." Tr. 200:24-201:9; *see also* DTX92. But patentees must make reasonable efforts to ensure that third parties mark practicing products. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996).

IGT previously suggested that Zynga had to provide "admissible evidence such as sworn

---

[3] Patentees must mark their products (or provide actual notice) to recover damages unless they assert only method claims. *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1309, 1317 (Fed. Cir. 2009). Because claim 10 is a system claim, the marking requirement applies to IGT.

testimony" to meets its burden of production.  Dkt. 170 at 2.  But IGT has no binding authority for that proposition.  *Arctic Cat* requires only "notice" that the patentee or a licensee "sold specific unmarked products which the alleged infringer believes practice the patent."  *Arctic Cat*, 876 F.3d at 1368.  Zynga's letter gave IGT notice of Zynga's belief that the four identified products practice the '189 patent and IGT's other (now invalid) patents.

Zynga's notice shifted the burden to IGT to *prove* that the four products Zynga identified in the letter do not practice the '189 patent.  *Id.*  IGT failed to do so.  It did not offer any testimony from its infringement expert, Mr. Friedman, on the four products named in Zynga's letter.  Instead, Mr. Calagero—IGT's own in-house counsel—testified that IGT determined that the named products do not *currently* practice the '189 patent.  Not only is Mr. Calagero not qualified to offer opinions about infringement because he "lack[s] the relevant technical expertise," *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008), but he also said nothing about the products during the relevant pre-suit time period (2015 to 2021).  Thus, no reasonable jury could rely on his testimony to find that IGT carried its burden of proof under *Arctic Cat*.

Here, Zynga had no actual notice of the '189 patent until IGT filed its complaint on April 6, 2021.  Because IGT and its licensee failed to mark practicing products before that date, IGT cannot recover damages for any pre-suit infringement.  Removing pre-suit damages limits IGT's damages request to post-suit damages only.

### 3.      Substantial evidence does not support any award of damages.

For the reasons explained above, IGT has not put forward any evidence sufficient to support any award of damages by the jury.  Any award of damages by the jury would therefore "not [be] supported by substantial evidence, but" instead be "based mainly on speculation and guesswork" and "against the clear weight of the evidence."  *Lucent Techs., Inc. v. Gateway, Inc.*,

580 F.3d 1301, 1335 (Fed. Cir. 2009).  IGT has not put into the record sufficient "evidence" to "sustain a finding that, at the time of infringement," Zynga and IGT would have agreed to a lump sum royalty commensurate with IGT's claimed damages award.  *Id.*  Moreover, IGT's relied-upon "license agreements" and "other evidence[] cannot, as a matter of law, support" *any* "damages award in this case."  *Id.*  Because "the evidence as presented did not reach the 'substantial evidence' threshold," "no reasonable jury could" find that IGT "carried its burden of proving that the evidence … supported" IGT's claimed damages award.  *Id.*

## III.    CONCLUSION

The Court should grant Zynga's motion for judgment as a matter of law that the accused products do not infringe claims 1 and 10 of the '189 patent and that IGT is not entitled to any award of damages.

Dated:  October 18, 2023                    Respectfully submitted,

By:  */s/ Clement S. Roberts*

Mark D. Siegmund
Texas Bar No. 24117055
CHERRY JOHNSON SIEGMUND JAMES, PLLC
400 Austin Ave., 9th Floor
Waco, Texas 76701
msiegmund@cjsjlaw.com
Telephone: (254) 732-2242
Facsimile: (866) 627-3509

Clement Seth Roberts, Bar No. 209203 (*Pro Hac Vice*)
croberts@orrick.com
Elizabeth R. Moulton, Bar No. 286937 (*Pro Hac Vice*)
emoulton@orrick.com
Will Melehani, Bar No. 285916 (*Pro Hac Vice*)
wmelehani@orrick.com
Sarah K. Mullins, Bar No. 324558 (*Pro Hac Vice*)
sarahmullins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5799

Bas de Blank, Bar No. 191487 (*Pro Hac Vice*)
basdeblank@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Rd.
Menlo Park, CA 94025
Telephone: +1 650 614 7400
Facsimile: +1 415 773 5799

26

Alyssa Caridis, Bar No. 260103 (*Pro Hac Vice*)
acaridis@orrick.com
Isaac S. Behnawa, Bar No. 342441 (*Pro Hac Vice*)
ibehnawa@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071
Telephone: +1 213 629 2020
Facsimile: +1 213 612 2499

Sten Jensen, Bar No. 443300 (*Pro Hac Vice*)
sjensen@orrick.com
William F. Stute, Bar No. 1032093 (*Pro Hac Vice*)
wstute@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street N.W.
Washington, DC 20005
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Lauren A. Weber, Bar No. 60909 (*Pro Hac Vice*)
lauren.weber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
Telephone: +1 206 839 4300
Facsimile: +1 206 839 4301

Joseph R. Kolker, N.Y. Bar No. 5476791 (*Admitted to W.D. Tex.*)
jkolker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: +1 212 506 5000
Facsimile: +1 212 506 5151

*Attorneys for Defendant Zynga Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document (and any declarations, exhibits, and proposed orders filed concurrently herewith) via email.

*/s/ Clement S. Roberts*