IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IGT and IGT CANADA SOLUTIONS ULC, | § | |
| | § | |
| Plaintiffs, | § | Case No. 1:23-cv-00885-ADA |
| | § | |
| v. | § | |
| | § | |
| ZYNGA INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## ZYNGA INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW REGARDING INVALIDITY

## TABLE OF CONTENTS

Page(s)

I.    LEGAL STANDARD.................................................................................................1

II.   ARGUMENT.........................................................................................................1

    A.    A Reasonable Jury Could Only Conclude That The '189 Patent Is
          Obvious.............................................................................................................1

    B.    A Reasonable Fact-Finder Could Only Conclude That The '189 Patent Is
          Not Patent-Eligible Under 35 U.S.C. § 101.............................................................9

III.  CONCLUSION.....................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. DirecTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016) ................................................................ 13

*Atlas Glob. Techs. LLC v. Zyxel Networks Corp.*,
    No. 6:22-CV-355-ADA, 2023 WL 3361214 (W.D. Tex. May 9, 2023) ............................ 7

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ................................................................ 13

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) ................................................................ 12

*Carmona v. Sw. Airlines Co.*,
    604 F.3d 848 (5th Cir. 2010) ................................................................... 1

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................ 12

*Credit Acceptance Corp. v. Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017) ................................................................ 11

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
    986 F.3d 1367 (Fed. Cir. 2021) ................................................................ 12

*Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*,
    243 F. App'x 603 (Fed. Cir. 2007) ............................................................. 7

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ............................................................ 11, 14

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020) ................................................................ 11

*Mortg. Grader, Inc. v. First Choice Loan Servs., Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ............................................................. 7, 12

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ................................................................ 11

*Ex Parte Schulhauser*,
    No. 2013-007847, 2016 WL 6277792 (P.T.A.B. Apr. 28, 2016) .................................. 7

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) ................................................................ 13

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) ................................................................................. 10

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) ................................................................................. 13

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) ................................................................................. 11

**Statutes**

35 U.S.C. § 101 ................................................................................................................. 9, 13

**Other Authorities**

Fed. R. Civ. P. 50(a) ........................................................................................................... 1

Defendant Zynga Inc. renews its previous motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) that it does not infringe the '189 patent and Plaintiff IGT is entitled to no damages, Dkt. 286, and Zynga respectfully moves pursuant to Rule 50(a) for judgment as a matter of law that claims 1 and 10 of IGT's '189 patent are invalid because they are obvious and patent-ineligible.

## I.     LEGAL STANDARD

Under Rule 50(a), judgment as a matter of law is proper "[i]f a party has been fully heard on an issue" and "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." This Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party," without "assess[ing] the credibility of the witnesses or weigh[ing] the evidence." *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 854-55 (5th Cir. 2010).

## II.    ARGUMENT

### A.     A Reasonable Jury Could Only Conclude That The '189 Patent Is Obvious.

Mulcahy is an Australian patent that was published on April 1, 1999. Tr. 818:6-14; DTX110 at 1 (Mulcahy). *See also, e.g.* Tr. 1166:4-16 (IGT's expert testifying on cross examination that Mulcahy came before the '189 patent and, like the '189 patent is "certainly in the gaming field" and that both concern online slot games). As IGT's expert acknowledged, Mulcahy says that an object of the invention is to provide a device for playing a slot machine-like game, software for executing the implementation of the game, and the necessary interface for player operation, while IGT's '189 patent also described virtually playing a slot-machine like game. Tr. 1167:6-17.

1

The Court should grant judgment as a matter of law that claims 1 and 10 of the '189 patent are invalid, because no reasonable jury could find that Mulcahy does not render the asserted claims obvious in view of the knowledge of a person of skill in the art.

Each limitation of claims 1 and 10 is disclosed or rendered obvious by Mulcahy, as explained below, so the asserted patent claims are invalid.

Mulcahy's invention "pertains to methods of electronic gaming and more particularly to a computer network implementation of a slot machine." See DTX110 at 2. Mulcahy recognizes that "[s]lot machines are one of the most popular games of chance"; Mulcahy believed that there was "an enormous demand for slot machine like products which could be delivered to and played with a networked computer." *Id.* Accordingly, Mulcahy describes a system where a player can use a Java applet on a remote device to play a slot machine game on a game server. Mulcahy describes how animations, such as spinning reels, "begins with the user pulling the virtual handle" (*id.* at 7), at which point the remote device sends a "request" to the game server. The game server returns a "ticket" and "[t]he applet interprets the ticket and extracts from it an indication of which positions its virtual reels should stop at and therefore which characters should be displayed." *Id.* at 6. Thus, the animation stops when the ticket is received. Mulcahy also teaches that the request and ticket are sent over a socket, *id.* at 5; as Dr. Crane testified, a POSITA would understand this to be a communications link between the remote device and the game server, Tr. 831:6-14; 833:4-11. As Dr. Crane explained, a POSITA would understand from Mulcahy that if the ticket is not received in response to the request within an expected time, the request would be resent. Tr. 845:11-846:5.

As Dr. Crane explained, Mulcahy teaches a robust simulation of a slot machine, in which the reels start when the player presses "spin," the ticket is sent, the outcome returned from server,

and reels stop when the outcome is received.  Tr. 822:8-823:5; 823:15-25.  Accordingly, if there is a communications link failure, the communications link would be re-established and the animation extended—because the animation only stops when the outcome is received.  Tr. 827:9-13 (explaining that "[i]n the Mulcahy invention, the wheels do not stop spinning until it receives the outcome and award from the server").

At trial, IGT did not dispute that Mulcahy establishes a communications link, but argued that Mulcahy does not describe that communications link failing or being re-established or the animation being extended during that failure.  *See, e.g.*, Tr. Tr. 1173:3-5 (IGT's expert acknowledged that in his report, he did not discuss Claim element [a], which recites a "communications link").  But as Dr. Crane testified, it would have been obvious to a POSITA that wireless communications can fail.  Tr. 825:19-826:8.  And because the animation starts when the request is sent and only stops when the ticket is received in response, then any delay in that communication would necessarily extend the animation.  Tr. 826:9-14; 827:6-13.

Dr. Crane provided the jury with substantial evidence from which a reasonable jury would be compelled to conclude that each asserted claim limitation is either disclosed or rendered obvious by Mulcahy.

The preamble of claim 1 provides that the claim is directed to:  **[1-preamble] "A remote gaming method comprising[.]"**  To the extent this is deemed limiting; Mulcahy disclosed and rendered this obvious, disclosing a claimed "gaming method" to play a slot machine over a computer network, i.e. the claimed "remote gaming method."  Tr. 829:3-22.

Limitation 1.a requires **"establishing a wireless communications link between a mobile gaming device, operated by a player, and a stationary gaming terminal that carries out a gaming program[.]"**  First, Dr. Crane explained that this was disclosed and rendered obvious by

Mulcahy's disclosure of the claimed "gaming device"—a user's personal computer—used to play the game. Tr. 829:23-830:11. As Dr. Crane testified, at the time of Mulcahy's filing, a POSITA would have understood that a user's PC could be a laptop computer, which is a mobile device. Tr. 830:12-19. IGT's expert agreed that Mulcahy displays a simulated slot machine *on a computer*. Tr. 1168:23-25. Second, Mulcahy disclosed the claimed "stationary gaming terminal that carries out a gaming program" (which it calls the "game server") that calculates the game result. Tr. 830:20-831:5. Third, Dr. Crane explained that Mulcahy specifically describes establishing a communications link between the user's device and the game server by direct socket "TCP/IP communication[,]" which operates over the Internet. Tr. 833:3-11. The "IP" in TCP/IP "stand[s] for Internet protocol[,]" "[s]o it is the communication protocol used over the internet." *Id.* IGT's expert acknowledged that in his report, he did not discuss Claim element [a]. Tr. 1173:3-5.

Limitation [1.b] requires **"receiving player control signals by the gaming terminal from the mobile gaming device to initiate a game[.]"** Dr. Crane testified that this was disclosed and rendered obvious by Mulcahy's disclosure of the claimed player control signals sent from the mobile game and received by the gaming terminal, which Mulcahy discloses as a user's mouse click, which starts the spin and issues a ticket request; the mouse click is interpreted by the applet (a program running on the user's PC), which then sends a signal to the gaming server. Tr. 833:17-834:22. As IGT's expert admitted, Mulcahy says that when the player clicks on the slot machine handle or the Spin button on the picture, that's interpreted as a command to issue a request for a ticket. Tr. 1169:1-16. And as IGT's expert further acknowledged, that request for a ticket is sent over a communication link from the player's device to the game server, which can be done over the Internet, Tr. 1170:8-16, resulting in the server receiving the request, Tr. 1170:17-25. IGT's

expert acknowledged that he does not dispute that Mulcahy teaches receiving player control signals by the gaming terminal from the mobile gaming device to initiate a game.  Tr. 1173:6-11.

Limitation [1.c] requires **"displaying game animation on the mobile gaming device for the game conveying to the player that the game is presently occurring[.]"**  Dr. Crane testified that this was disclosed and rendered obvious by Mulcahy's disclosure of "spinning the reels, which would indicate to a player that the game is operating, proceeding, occurring," which would be a "game animation."  Tr. 834:23-835:24.  And as IGT's expert acknowledged, Mulachy displays a simulated slot machine on a computer, Tr. 1168:23-25, and clicking the slot machine handle in Mulcahy would result in the animation of the reel spin, Tr. 1169:25-1170:3.  As IGT's expert further agreed, that spinning animation would be conveying to the player that the game started.  Tr. 1170:4-7.  IGT's expert acknowledged that he does not dispute that Mulcahy discloses displaying a game animation on the mobile device for the game conveying to the player that the game is presently occurring.  Tr. 1173:13-18.

Limitation [1.d] requires **"carrying out the game by the gaming terminal, including determining a final outcome of the game and any award for the outcome[.]"**  Dr. Crane testified that this was disclosed and rendered obvious by Mulcahy's disclosure of a "game server" that "is calculating the slot machine result using one or more random numbers to determine the outcome," which "gets communicated to [] back to the PC, as does the payout, including bonus, if any, also determined by the server."  Tr. 835:25-836:15.  In Mulcahy's invention, then, the game terminal/server is determining both the final outcome of the game and any award for the outcome.  Tr. 836:16-19.  As IGT's expert admitted, both Mulcahy and the '189 patent describe "server-authoritative game[s]," Tr. 1168:1-11, and it is Mulcahy's gaming terminal that determines the

outcome of the game and also the payout, if any, for that outcome, Tr. 1171:1-5. IGT's expert acknowledged that he does not dispute that Mulcahy teaches this limitation.  Tr. 1173:19-21.

Limitation [1.e] requires **"transmitting signals from the gaming terminal to the mobile gaming device identifying the final outcome of the game and the award[.]"** Dr. Crane testified that this was disclosed and rendered obvious by Mulcahy's disclosure of a "ticket," which "is defined in the patent as a packet of data," and which "is the information that is sent back to the mobile gaming device." Tr. 836:20-837:6.  As Dr. Crane explained to the jury, using an illustration, "[w]hat's shown is the contents of that ticket after it's been calculated by the remote gaming terminal. It's showing where to stop the reels and how much to award." Tr. 837:7-12. And as IGT's expert acknowledged, Mulcahy's game terminal delivers the ticket back to the player's computer.  Tr. 1171:6-14. IGT's expert acknowledged that he does not dispute that Mulcahy teaches this limitation.  Tr. 1173:22-23.

Limitation [1.f] requires **"stopping the game animation for the game and displaying, by the mobile gaming device, the final outcome of the game and the award[.]"** Dr. Crane testified that this was disclosed and rendered obvious by Mulcahy's disclosure that "at this point once it's received that ticket, it makes the sound effects stop and ceases the spinning reel depiction, which is the animation of the spinning wheels." Tr. 837:13-838:4.  As IGT's expert admitted, when Mulachy's server sends the ticket back to the computer, the computer/gaming device stops its animation when it receives the ticket.  Tr. 1171:16-24.  Dr. Crane testified that Mulcahy's description of displaying the static reel display in accordance with the method described would be the outcome displayed to the player, and that Mulcahy's description of the display to depict the user's updated virtual account information and other information associated with a win would

include the award.  Tr. 838:5-23.  IGT's expert acknowledged that he does not dispute that Mulcahy teaches this limitation.  Tr. 1173:22-23.

Limitation [1.g] requires **"in the event of a communications link failure between the mobile gaming device and the gaming terminal during the game, prior to receiving the signals by the mobile gaming device identifying the final outcome of the game and the award but after the game animation for the game has begun, performing the method comprising[.]"**

***First***, Limitation [1.g] is a conditional limitation:  the remaining steps of the claim are only carried out *if* there is a communications link failure.  If there is no communications link failure, the method is complete at step [1.f] and Mulcahy fully discloses or renders obvious the claim.  In other words, Mulcahy does not need to disclose the remaining contingent steps in method claim 1 to invalidate the claim.  *See Ex Parte Schulhauser*, No. 2013-007847, 2016 WL 6277792, at *3– *5 (P.T.A.B. Apr. 28, 2016); *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 F. App'x 603, 606–07 (Fed. Cir. 2007) ("It is of course true that method steps may be contingent.  If the condition for performing a contingent step is not satisfied, the performance recited by the step need not be carried out in order for the claimed method to be performed.").  *Atlas Glob. Techs. LLC v. Zyxel Networks Corp.*, No. 6:22-CV-355-ADA, 2023 WL 3361214, at *23 (W.D. Tex. May 9, 2023) ("In the independent claim, if the condition is not met then 'transmitting first Channel State Information (CSI) feedback in response to receiving the NDP' is not required.").

***Second***, even if the remaining steps need to be performed to invalidate the method claim, Dr. Crane testified that these steps are disclosed and rendered obvious by Mulcahy's disclosure of a TCP/IP communications link, because a POSITA would understand that packets could be dropped, that the Internet is not perfect, and that there could be a communication link failure.  Tr. 839:19-840:18.  *See also* Tr. 842:10-18 (testifying that in 1999, 2012, and today, a POSITA would

understand that when you try to send something over the Internet, it does not always work and that sometimes the communication link can fail). IGT's expert agreed that a POSITA in 2013 would understand that a communication link, or any network connection, could fail. Tr. 1174:20-23, 1175:14-19. And as Dr. Crane explained, Mulcahy even "mentions that" possibility "at the top of the patent," noting that game flow over the network can be interrupted or cease without warning. Tr. 840:12-24. IGT's expert agreed that Mulcahy specifically talked about the fact that data flow over a network can become interrupted or cease without warning. Tr. 1176:23-1177:1.

Limitation [1.h] requires **"extending the game animation for the game by the mobile gaming device during the communications link failure beyond a typical time for the game until the communications link has been re-established; and[.]"** Limitation [1.i] requires **"once the communication link has been re-established, transmitting the signals to the mobile gaming device identifying the final outcome of the game and the award, stopping the game animation for the game, and displaying, by the mobile gaming device, the final outcome of the game and the award, such that the game perceived by the player is not interrupted during the communications link failure."** Dr. Crane testified that these limitations were disclosed and rendered obvious by Mulcahy's disclosure, or at the very least by Mulcahy in light of a POSITA's knowledge. Tr. 842:19-844:14; 848:23-849:3. For example, a POSITA would understand that the TCP/IP protocol has built-in methods for detecting packet loss, and that lost or unacknowledged packets are re-sent. Tr. 845:11-846:5. *See also* Tr. 1178:23-1179:8 (IGT's expert testifying that Mulcahy talks about TCP/IP protocol, which has built in methods for detecting packet loss, and that lost or unacknowledged packets are re-sent). Because the gaming animation starts when the gaming device transmits the requests for a ticket to the gaming terminal, and ends when the gaming device receives a ticket from the gaming terminal, if either of those transmissions is lost and needs

to be retransmitted, the duration of the animation will be extended and the animation will continue until the ticket is received.  Tr. 842:19-844:14.  Dr. Crane further supported his testimony by showing the jury an animation illustrating how Mulcahy's invention would work if there were a communication link failure in the narrow window of time claimed.  Tr. 846:6-847:4.  As Dr. Crane explained, the animation shows "the laptop connected to a remote game server connected by the Internet, and when the game starts, it's going to send a packet requesting a slot result from the server."  Tr. 846:14-18.  "The server processes that uses random numbers, determines where to stop, and in an attempt to send that back, we find there's a connection lost. Once it's restored, the machine finally gets it."  Tr. 846:19-22.  Then, when the laptop receives the outcome and award, "[i]t stops the reels and shows which symbols should be shown based on the outcome sent and then displays the award."  Tr. 846:23-847:4.  *See also* Tr. 1179:9-13 (IGT's expert testifying that in Mulcahy, the animation of the reels spinning on the gaming device stops when the gaming device receives the ticket from the server); 1180:9-13 (IGT's expert agreeing that in Mulcahy, the player's device would not know the outcome of the spin until it receives the ticket from the server).

Claim 10 is directed to a system/apparatus programmed to carry out the method of claim 1.  As Dr. Crane explained, Claim 10 is also disclosed and rendered obvious by Mulcahy's disclosure, or at the very least by Mulcahy in light of a POSITA's knowledge, for parallel reasons to those discussed above.  Tr. 849:10-850:15.

### B.    A Reasonable Fact-Finder Could Only Conclude That The '189 Patent Is Not Patent-Eligible Under 35 U.S.C. § 101.

The asserted claims are directed to the abstract idea of keeping participants distracted during a break in programming, and they fail to supply any inventive concept.  The '189 patent concedes that "[u]sing a wireless hand-held device … to remotely play an otherwise conventional gaming machine in a casino is prior art."  PTX1 at 1:25-27.  So for claims 1 and 10, the only

9

claimed improvement over the prior art is that if the hand-held device loses its connection with the gaming machine, the device will continue displaying the "game animation" until "the communications link has been re-established," at which point the device displays the game's "final outcome."  PTX1 at 23:48-51, 24:50-53.  In other words, the '189 patent purports to distract the player so he remains "unaware" that the communications link was disrupted.  PTX1 at 4:41-44. Managing a person's attention in this way is a basic means of organizing human activity, and claims 1 and 10 fail both steps of the *Alice* inquiry.

**Step One.**  Claims 1 and 10 claim extending the display of ordinary game animation, such as a spinning reel, during the "5 seconds" or "15 seconds" that the communications link might be broken if a player walks too far away from the gaming machine.  PTX1 at 4:57, 11:26.  There is nothing inventive about the animation itself, which has long existed in casino games and which the specification calls "generic."  PTX1 at 10:35-36.  And the claims require only generic computer components, such as a "gaming terminal" and a "mobile gaming device," to display the animation.

As for extending the animation during a communication lull, that serves only to maintain the player's attention for a brief period before another event occurs.  Extending entertainment to fill time until a result is a "method[] of organizing human activity" that falls within the category of patent-ineligible abstract ideas.  *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016).  For instance, if the next presenter at an awards show is delayed in getting to the stage, the show's emcee registers the delay and tells jokes to keep the audience's attention until the presenter appears.  Similarly, when a televised college football game pauses for commercial breaks, the host school keeps fans in the stadium engaged by having the marching band play a song or by bringing attendees of note onto the field until play resumes.  The same thing happens when a host at an athletic competition fills time with interesting facts about an athlete while waiting

for judges to tabulate a final score.  Or a band playing live music might repeat a segment of a song an indefinite number of times until their soloist signals that she is ready to perform.

In short, the abstract idea of keeping people entertained (and thus distracted) during a break in an event "is pervasive in human activity." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020).  And performing this same method on a generic computer screen demonstrates merely "[a]utomation or digitization of a conventional method of organizing human activity," which "does not bring the claims out of the realm of abstractness." *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022); *see also Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (similar).

Moreover, claims 1 and 10 lack "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  The claims do not provide any details about *how* the game animation is extended.  Instead, they "merely make generic functional recitations" that the extension occurs when the communications link breaks. *Ericsson*, 955 F.3d at 1328.  That is not enough to save the claims from abstraction at step one. *SAP Am.*, 898 F.3d at 1168.

**Step Two.**  The result remains the same at step two, because nothing in the claims supplies the inventive concept necessary to "transform them into patent-eligible applications of the abstract idea at their core." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

First, as noted above, the '189 patent relies on generic computer components to perform the abstract idea of keeping a person entertained.  Claims 1 and 10 both recite, among other things, "a mobile gaming device," "a wireless communications link," and a "gaming terminal."  The specification admits that "any suitable mobile device" will suffice, and "most" of its examples use a "conventional tablet."  PTX1 at 3:34-37; *see also* PTX1 at 21:59-62 ("the various methods or

processes outlined herein may be coded as software that is executable on one or more processors that employ any one of a variety of operating systems"). As Mr. Crane noted, "you could even use your own iPad." Tr. 742:25-743:1. Mr. Friedman also agreed that the claims require only generic technology, such as a "phone or [a] tablet" and a "server." Tr. 325:9-13. Claims that "'add' only generic computer components" to an abstract idea "do not satisfy the inventive concept requirement." *Mortg. Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016).

Second, as Mr. Crane testified, the '189 patent claims only "well-understood, routine, and conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014). Mr. Crane explained that "[y]ou can look at any one of those [claim elements] and it's similar things that had been done in the past." Tr. 743:11-18. Again, the patent itself concedes that using a mobile device "to remotely play an otherwise conventional gaming machine in a casino is prior art." PTX1 at 1:25-27. And David Froy, the '189 patent's inventor, conceded that the elements of claims 1 and 10, such as "a wireless communication link that exists between a mobile gaming device and a gaming terminal," already existed before the '189 patent. Tr. 131:15-132:7, 134:15-18, 135:10-136:2. Moreover, the patent admits that the extended animation is nothing more than "a generic animation of blurred symbols moving down vertically to simulate actual reels spinning." PTX1 at 10:35-36. And where a claim's "only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

Mr. Crane also explained to the jury that the '189 patent does not provide "a technological solution to a technological problem." *See cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367,

1378 (Fed. Cir. 2021). Instead, "these claims are talking about perception in the mind of the player." Tr. 743:6-10. Indeed, the claims make this clear, claiming to extend the generic animation during any communications link failure "such that the game perceived by the player is not interrupted during the communications link failure." PTX1 at 23:57-59. And there is simply "no description in the patent of a specific technical solution by which" the animation is extended during a communications link failure. *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1352 (Fed. Cir. 2021). The specification just says, for example, that an "internal program in the tablet … causes the animated reels to keep spinning, so the player believes the game is still occurring." PTX1 at 11:21-24.

To be sure, Mr. Friedman testified that the claims were not "well-understood" because "this Mulcahy reference … doesn't mention all of the claim limitations anyway." Tr. 1153:14-21. Setting aside the accuracy of Mr. Friedman's statement, *but see supra*, the mere fact that one piece of prior art might not contain every claim limitation says nothing about whether the claim elements would have been well-understood to "a skilled artisan in the relevant field," *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Mr. Friedman also testified that the claims were not "routine or conventional" because "there's no evidence" that "everyone was doing it." Tr. 1153:25-1154:5. But that is just another way of saying that the claimed system and method are novel. Novelty cannot "avoid the problem of abstractness," *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016), because "a claim for a *new* abstract idea is still an abstract idea," *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016). So whether the asserted claims are novel has no bearing on the § 101 inquiry.

Lastly, cabining the claimed method and system to the casino context does not provide the requisite inventive concept. Time and again, the Federal Circuit has explained that "limiting"

claims to a "particular technological environment" cannot make them patent-eligible.  *See Elec. Power*, 830 F.3d at 1354 (collecting cases).

**III.     CONCLUSION**

The Court should grant judgment as a matter of law that claims 1 and 10 of the '189 patent are invalid.

Dated:  October 19, 2023                    Respectfully submitted,

By:  */s/ Alyssa Caridis*
_____

Mark D. Siegmund
Texas Bar No. 24117055
CHERRY JOHNSON SIEGMUND JAMES, PLLC
400 Austin Ave., 9th Floor
Waco, Texas 76701
msiegmund@cjsjlaw.com
Telephone: (254) 732-2242
Facsimile: (866) 627-3509

Clement Seth Roberts, Bar No. 209203 (*Pro Hac Vice*)
croberts@orrick.com
Elizabeth R. Moulton, Bar No. 286937 (*Pro Hac Vice*)
emoulton@orrick.com
Will Melehani, Bar No. 285916 (*Pro Hac Vice*)
wmelehani@orrick.com
Sarah K. Mullins, Bar No. 324558 (*Pro Hac Vice*)
sarahmullins@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5799

Bas de Blank, Bar No. 191487 (*Pro Hac Vice*)
basdeblank@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Rd.
Menlo Park, CA 94025
Telephone: +1 650 614 7400
Facsimile: +1 415 773 5799

Alyssa Caridis, Bar No. 260103 (*Pro Hac Vice*)
acaridis@orrick.com
Isaac S. Behnawa, Bar No. 342441 (*Pro Hac Vice*)
ibehnawa@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071
Telephone: +1 213 629 2020
Facsimile: +1 213 612 2499

Sten Jensen, Bar No. 443300 (*Pro Hac Vice*)
sjensen@orrick.com
William F. Stute, Bar No. 1032093 (*Pro Hac Vice*)
wstute@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street N.W.
Washington, DC 20005
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Lauren A. Weber, Bar No. 60909 (*Pro Hac Vice*)
lauren.weber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101
Telephone: +1 206 839 4300
Facsimile: +1 206 839 4301

Joseph R. Kolker, N.Y. Bar No. 5476791 (*Admitted to W.D. Tex.*)
jkolker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: +1 212 506 5000
Facsimile: +1 212 506 5151

*Attorneys for Defendant Zynga Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document (and any declarations, exhibits, and proposed orders filed concurrently herewith) via email.

*/s/ Alyssa Caridis*